UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


FLSMIDTH AIRTECH, INC.       )
      )
v.       )       NO. 2:11-CV-357
      )
FIBER INNOVATION TECHNOLOGY, INC.       )

## MEMORANDUM OPINION AND ORDER

This case is before the Court following a two day bench trial on May 1-2, 2013, for findings of fact and conclusions of law. The plaintiff FLSmidth Airtech, Inc. ("FLSmidth" or "AFT" (AFT Division of FlSmidth)) filed the complaint in this case against the defendant Fiber Innovation Technology, Inc. ("FIT") based upon claims of breach of contract, promissory estoppel, and unjust enrichment. For the reasons set out below, judgment will be entered for the plaintiff on its claim of unjust enrichment.

## I. FINDINGS OF FACT

### A. JOINT STIPULATIONS AND ADMISSIONS IN THE FINAL PRETRIAL ORDER:

1. Effective 11:59 PM EST on 31 December 2011, F.L.Smith Airtech Inc., the original plaintiff in this action, merged into FLSmidth Inc., which was the surviving entity. FLSmidth Inc. is the successor in interest to FLSmidth Airtech Inc.

2. Defendant, FIT, is a corporation organized and existing pursuant to the laws of the State of Tennessee. Defendant's principal office is located at 398 Innovation Drive, Johnson City, TN 37604. Defendant's registered agent for service of process is Mike O. Holt, 398 Innovation Drive,

Johnson City, TN 37604.

3. This Court has personal jurisdiction over FIT for the claims asserted herein.

4. This Court has subject matter jurisdiction over the claims and defenses asserted herein.

5. Venue is proper in this Court.

6. FLSmidth, through its Advanced Filtration Technologies ("AFT") Division, manufactures filter bags for industrial applications, including power plants, cement manufacturing, utilities, incineration applications and the mining and mineral industry.

7. These filter bags remove particulate from gases before they are released into the atmosphere.

8. In manufacturing the filter bags, FLSmidth uses, *inter alia*, a product called PPS felt that it purchases from felt manufacturers, one example of which is a company named Southern Felt Company ("Southern Felt").

9. The felt manufacturers utilize a product called PPS fiber, which is spun by fiber manufacturers such as FIT and others, and then used by the felt manufactures such as Southern Felt in making the felt.

10. Fiber manufacturers, such as FIT, utilize raw material known as PPS resin in the manufacturing of PPS fiber.

11. At all times relevant to these proceedings, FIT has purchased its PPS resin from Ticona Polymers, Inc. ("Ticona").

12. FIT is in the business of manufacturing stable fibers which includes PPS fibers.

13. PPS fibers are high temperature chemical resistant fibers with a high melt temperature that primarily go into hot gas filtration bags for coal fired power plants.

2

14. FIT has been in the manufacture of PPS fiber since 2004.

15. There were no business dealings between FIT and AFT prior to October of 2007.

16. In the Fall of 2007, FIT was informed by representatives of Southern Felt that FIT's competitors for PPS fiber sales to the filtration bag industry were offering rebates to the filter bag manufacturing for specifying their brand of PPS fiber in the manufacture of felt used in the filter bags.

17. FIT has never paid any rebate to FLSmidth that FLSmidth claims that FIT owes for the years 2008 and 2009.

18. In early 2010, FIT and FLSmidth executed a written agreement for the period beginning January 2010 and ending December 2011.

19. FIT was paid in full for all of the PPS fiber it sold to Southern Felt in 2008 and 2009.

### *B.  UNDISPUTED FACTS PREVIOUSLY ADOPTED BY THE COURT*

1. In 2005, FIT was approached by one of its customers, Southern Felt with the suggestion that FIT should start manufacturing PPS fiber due to an alleged shortage in the market.

2. As a result of this suggestion, FIT began selling PPS fiber for use in filtration bags for coal fired power plants in mid-2005.

3. PPS fiber is spun from PPS resin which is a plastic or polymer.

4. AFT purchases a particular media such as needled felt, a woven synthetic or a woven fiberglass which AFT converts to a filter bag that is sold to AFT's customers.

5. In this case, the supply chain for the manufacturing process of filter bags occurred as follows: Ticona supplied the PPS resin to FIT.   From the PPS resin, FIT spun PPS fiber that it sold to felt manufacturers such as Southern Felt.   Southern Felt then manufactured felt from the PPS

3

fibers sold by FIT or other PPS fiber manufacturers. AFT then purchased the felt from Southern Felt or other felt manufacturers. AFT then sold filter bags to the various industries referenced above.

6. FIT was never a direct supplier to AFT.

7. AFT did not buy fiber from FIT.

8. AFT sold filter bags to customers in various industries, but FIT was not a customer of AFT.

9. On October 11, 2007, Michael Hodge ("Hodge"), FITs Vice President of Sales, and two Ticona representatives met with Larry Patterson ("Patterson"), the President of AFT, at AFT's offices in Evans, Georgia.

10. The purpose of the meeting was to discuss a business opportunity for AFT to specify FIT PPS fiber made with polymer supplied by Ticona for felt to be purchased by AFT for use by AFT in the manufacture of filtration bags.

11. Patterson, at the meeting, informed Hodge and the Ticona representatives that AFT had filter bag business that would require 1.2 million pounds of PPS fiber in the 3rd quarter of 2007 and the first three quarters of 2008 but, in order for FIT and Ticona to have an opportunity to participate in this business, AFT would have to be paid a rebate.

12. Following the October 11, 2007 meeting, Hodge, on behalf of FIT and Ticona, made a rebate offer to Patterson of AFT by letter dated October 16, 2007.

13. Patterson never signed the October 16, 2007 letter nor did AFT ever accept the offer that was contained in Hodge's letter.

14. During the period 2008 and 2009, FIT did not receive a rebate from Ticona on resin (polymer) purchases that was spun into PPS fiber and sold to Southern Felt and used by Southern

4

Felt in felt sold to AFT.

15. Ticona refused to pay FIT a rebate in 2008 or 2009 because AFT had not established that 1.2 million pounds of PPS fiber was purchased by AFT's felt manufacturers during the time period that AFT was seeking payment of the rebate.

16. On May 28, 2008, Hodge sent an email to Patterson at FLSmidth. (Hodge

17. In his May 28, 2008 email, Hodge stated:

> During our visit on May 14, we shared with you the frustration that both FIT and Ticona were feeling with the slow communication from AFT concerning the business that we agreed to support you on. … We have not seen this information yet and, to be honest with you, our management is beginning to question our decision to support AFT on business that they perceive may not exist.

18. FLSmidth sent a second request for payment of the rebate – this time for purchases during the second quarter of 2008 – to Hodge at FIT on June 25, 2008.

19. This rebate request was for "133,476.23 lbs at $0.57/lb. The total value of the rebate for the second quarter of 2008 is equal to $76,081.45."

20. FLSmidth then sent its next request for payment of the rebate for purchases during the period beginning July 2008 and ending in mid-December 2008 by letter dated December 16, 2008.

21. Therein, FLSmidth requested a rebate for "332,146.73 lbs at $0.57/per lb. The total value of the rebate for this period in 2008 is equal to $189,323.63."

22. On August 12, 2009, Ms. Henderer, an FLSmidth employee, emailed Hodge the following:

> Michael:
>
> I have left several messages on your phone and for some reason you have not been able to return my calls.

5

Could you please determine if we owe you anything else or if you have all the paperwork you need because it is important for us to be able to clear up the rebates before we get to the end of this year? Time is marching on and we have not received any of the money to date for any of the increments I have sent to you ….

23. In his response on August 25, 2009, Hodge stated:

Ruth Ann,
I am attaching a spreadsheet with the claims that we need PO's for to process the rebate. The ones I need are highlighted. In pink.

24. FLSmidth forwarded its next request for payment on August 28, 2009 for purchases during January through July 2009.

25. Therein, FLSmidth requested FIT rebate the amount of $67,376.90 for "118,205.10 lbs at $.57/per lb."

26. Ms. Henderer then sent an email to Mr. Hodge on January 11, 2010 forwarding information received by FLSmidth from Southern Felt validating the FIT material purchased and used in felt sold to FLSmidth for the years 2008 and 2009.

27. In response, Mr. Hodge sent Ms. Henderer an email dated January 15, 2010 wherein he stated:

Ruth Ann,
The information you sent appears to be in order. I will submit to Ticona once I receive copies of the orders for the ones noted in your spread sheet.

28. Ms. Henderer then forwarded Mr. Hodge the information mentioned in the above-referenced correspondence by letter dated January 18, 2010, and also by email on that same date, per the request of Mr. Hodge.

29. In addition, Ms. Henderer again requested the full rebate due for all of 2009 in the

amount of $134,888.50, as well as the past-due rebate for 2008 in the amount of $368,540.15, for a total rebate due and owing for 2008 and 2009 in the amount of $503,428.66. [1]

30.   Had FLSmidth known in the 2008 and 2009 time frame that FIT would not honor its agreement to the $0.57 per pound rebate, FLSmidth would have directed its business to other fiber providers with whom it also had rebate agreements during that time.

### *C.  ADDITIONAL FACTS ESTABLISHED AT TRIAL*

1. Hodge testified at trial that at the October 11, 2007 meeting between Hodge, FIT's Vice President of Sales, Patterson, President of FLSmidth's AFT Division, and others at FLSmidth's facilities in Evans, Georgia, Patterson informed him that FIT's competitors were offering a rebate of $0.40 per pound for PPS fiber and that if FIT wanted FLSmidth to specify FIT PPS fiber, it would have to provide an agreeable rebate to FLSmidth for this business.

2. On October 22, 2007, after receiving Hodge's offer letter dated October 16, 2007 ("Offer Letter") (Trial Exhibit 1),  Patterson contacted Hodge by telephone to reject FIT's offer and to convey the terms of FLSmidth's counter-offer.   Pursuant to the terms of the counter-offer, FLSmidth offered to specify FIT PPS fiber on felt purchased by FLSmidth in exchange for FIT's agreement to pay a rebate of $0.57 per pound.  Hodge specifically admitted at trial that Patterson rejected FIT's offer and made the above counter-offer. Hodge also testified that neither party discussed any contingencies to the payment of the rebate, specifically, there was no discussion of a contingency of 1.2 mm pounds of fiber purchased from FIT.

3. Upon receiving FLSmidth's counter-offer of a $0.57 per pound rebate,  Hodge conferred with FIT's raw material supplier, Ticona regarding the counter-offer.  Hodge testified that Ticona

---

[1] The calculation of these damage amounts was revised by Ms. Henderer on May 2, 2013 during trial.

agreed to support FIT on FLSmidth's counter-offer of $0.57 per pound. Hodge also received the necessary approvals within FIT to accept FLSmidth's $0.57 per pound rebate counter-offer.

4. On October 24, 2007, Hodge called Patterson by telephone on behalf of FIT and accepted FLSmidth's counter-offer. Patterson testified that he believed the parties reached an agreement during this call. Further, Hodge admitted at trial that the parties reached an agreement on this telephone call. He also admitted that the parties did not discuss any minimum sales contingencies during this telephone conversation.

5. Beginning in November 2007, FLSmidth began specifying FIT PPS fiber on purchase orders for PPS from Southern Felt. For example, purchase orders 9696, 9697, 9701, and 9695 all have order dates of November 16, 2007, and all specify the use of FIT fiber.

6. Plaintiff relies on a letter dated February 15, 2008, from Patterson to Hodge in contending that a rebate contract existed between the parties. [Trial Exhibit No. 8]. This letter states in part that "[t]his is to confirm the agreement between our two companies for the purchase of PPS felt. We will submit quarterly information requesting the rebate of $.57 per lb. for purchases knowing that widths and weights will vary. We will include copies of the invoices for your records as backup of the purchases. . ."

7. Both Hodge and Mike Holt, President and CEO of FIT, testified that they did not receive this letter until after suit was filed. They also both testified that they made a thorough search of their records including e-mail archives and did not find a copy of this letter.

8. Pursuant to the parties' $0.57 per pound rebate agreement, FLSmidth expressly specified FIT's PP fiber on the following purchase orders claimed by FLSmidth during 2008 (collective Trial Exhibit 29): 9696, 9697, 9701, 9695, 10107, 10108, 10198, 9699, 9700, 10164, and 9702. The

Court credits the uncontroverted testimony of Ben Davis from Southern Felt, who testified that each of these purchase orders expressly specified FIT's PPS fiber for use in the PPS felt purchased pursuant to these purchase orders.

9. Pursuant to the parties' $0.57 per pound rebate agreement, FLSmidth expressly specified FIT's PPS fiber on the following purchase orders claimed by FLSmidth for 2009: 11168, 11296, 11225, 11190, 11663, 11805, 11709, 11345, 11380, 12250, and 12254 (collective Trial Exhibit 30). Ben Davis also testified that each of these purchase orders expressly specified FIT's PPS fiber for use in the PPS felt purchased pursuant to these purchase orders.

10. Hodge testified that FIT received $6.50 per pound of fiber purchased from Southern Felt during this period and that Southern Felt paid FIT in full for all of the fiber purchased.

11. FIT received this benefit without paying any rebates to FLSmidth.

12. Hodge further testified that the only reason FIT did not pay FLSmidth the $0.57 per pound rebate was because FIT was unable to collect a rebate from its supplier, Ticona, for the years 2008 and 2009. Hodge testified that had FIT received its rebate from Ticona it would have paid FLSmidth the $0.57 per pound rebate due. In Hodge's May 18, 2008 email (Trial Exhibit 8), he wrote to Patterson and stated, "We understand that the bag house business will never be totally predictable and work on a "schedule" but we do expect AFT to keep us in the loop on any business changes that affect both the timing and quantity of these programs."

## IV . ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. BREACH OF CONTRACT CLAIM

The Statute of Frauds requires that parties memorialize certain types of contracts in writing for the contract to be enforceable. "A defense predicated upon the statute of frauds must, of

necessity, presume that the parties had an agreement but that Tennessee Code Annotated § 29-2-101 renders this agreement unenforceable because it is one of those species of agreements required to be in writing." *Price v. Mercury Supply Co. Inc.,* 682 S.W.2d 924, 931 (Tenn.Ct.Ap.1984). The Statute of Frauds prohibits a party from maintaining certain types of contract actions without a written note or memorandum of the alleged agreement, signed by the party to be charged. *Shedd v. Gaylord Entm't. Co.,* 118 S.W.3d 695, 697 (Tenn.Ct.App.2003).    Although Larry Patterson testified that after a meeting with Mike Hodge on January 28, 2008, the rebate agreement was memorialized in a letter to Mike Hodge dated February 15, 2008,  Hodge testified that he never received this letter.  In any event, there is no evidence that the party to be charged, i.e. FIT, ever signed any such agreement.

Based upon the facts in this case, the Court FINDS that there was no written note or memorandum of the alleged agreement signed by the party to be charged.  Therefore,  this breach of contract cause of action must fail unless an exception to the Statute of Frauds raised by the plaintiff exists, that is, the agreement could be performed in one year and/or partial performance.

The Statute of Frauds has been construed to apply to contracts where, by express understanding of the parties, it was agreed the contract would not be performed within the year. *Trew v. Ogle,* 767 S.W.2d 662, 664 (Tenn.Ct.App.1988).    The Tennessee Statute of Frauds, Tennessee Code Annotated § 29–2–101 provides in pertinent part:

> (a) No action shall be brought:

> (5) Upon any agreement or contract which is not to be performed within the space of one (1) year from the making of the agreement or contract; unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person lawfully authorized by such party....

10

Courts in Tennessee "have declined to construe a contract to require performance over more than one year if to do so would render the contract unenforceable because of the statute of frauds." *Price v. Mercury Supply Co., Inc.,* 682 S.W.2d 924, 932 (Tenn.Ct.App.1984). There was no express understanding of the parties that the contract could have been performed in one year.

Although FIT contends that the purchase of 1.2 million pounds of fiber was a contingency before payment would made on a rebate, AFT admittedly specified less than 900,000 pounds of FIT fiber in 2008 and 2009. Therefore, there was no express understanding of the parties that the contract could have been performed in one year because AFT continued to specify FIT fiber for more than two years without anything having been signed by FIT.

AFT also contends that the part performance exception to Statute of Frauds applies in this case. Tennessee courts have recognized a partial performance exception to the Statute of Frauds which is applicable to oral contracts other than for the sale of land. *Blasingame v. American Materials, Inc.,* 654 S.W.2d 659, 663 (Tenn.1983); *Foust v. Carney,* 329 S.W.2d 826, 829 (1959); *Buice v. Scruggs Equipment Co.,* 250 S.W.2d 44, 47 (1952). The Tennessee Supreme Court, in *Buice,,* explained the partial performance exception to the Statute of Frauds:

> The doctrine of partial performance to take the verbal contract out of the operation of the Statute of Frauds is purely an equitable doctrine and is a judicial interpretation of the acts of the parties to prevent fraud. The acts of the appellant relied on as partial performance had been done by him in pursuance to the averred contract and agreement and are clearly referable thereto. "The plaintiff must be able to show such acts and conduct of the defendant as the court would hold to amount to a representation that he proposed to stand by his agreement and not avail himself of the statute to escape its performance; and also that the plaintiff, in reliance on this representation, has proceeded, either in performance or pursuance of his contract, so far to alter his position as to incur an unjust and unconscionable injury

and loss, in case the defendant is permitted after all to rely upon the
statutory defense."

*Id. at 47.*

Although FIT sold fiber to Southern Felt, Mike Hodge testified that he did not know who the customer was when he sold PPS fiber to Southern Felt. He testified that the only time FIT knew who the customer was when Southern Felt was asked to verify rebate claims because AFT, Midweco and Menardi all manufactured filter bags. Therefore, FIT's acts and conduct in selling PPS fiber to Southern Felt did not amount to a representation that FIT would to stand by an agreement with AFT and not avail itself of "the statute to escape its performance." Id. at 47.

Therefore, the plaintiff has failed to produce a written note or memorandum of the alleged agreement signed by the party to be charged, and an exception to the Statute of Frauds does not exist. Accordingly, based upon the Statute of Frauds, the plaintiff's breach of contract claim must fail and that claim must be dismissed.

## B. PROMISSORY ESTOPPEL

In the alternative to the breach of contract claim, plaintiff also brings a promissory estoppel claim against the defendant. Tennessee courts refer to claims of promissory estoppel and detrimental reliance interchangeably. *Shedd,* 118 S.W.3d at 700. These claims arise when there is a "promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee," and when the promise "does induce such action or forbearance." *Id.* In these situations, the promise is binding "if injustice can be avoided only by enforcement of the promise." *Id.* In *Nationsbank, N.A. (South) v. Millington Homes Investors, Ltd.,* No. 02A01-9805-CH-00134, 1999 WL 79204 at * 3-4 (Tenn.App. Feb. 19, 1999), the Court discussed the distinct difference between the doctrines of promissory estoppel and equitable estoppel

12

and concluded that "promissory estoppel is a sword, based on the failure to deliver on a promise, while equitable estoppel is a shield a plaintiff can raise against the defense of the Statute of Frauds when the defendant has knowingly misrepresented a fact." *Seramur v. Life Care Ctrs. of Am., Inc.,* 2009 WL 890885, at *5 (Tenn.Ct.App. Apr.2, 2009); *Nationsbank,* at *3-4. The Court having concluded that the statute of frauds applies to plaintiff's breach of contract claim, promissory estoppel is also not applicable to this case because it is not an exception to the Statute of Frauds. *Hood Land Trust v. Hastings,* 2010 WL 3928647, *6 (Tenn.Ct.App. 2010).

## C. UNJUST ENRICHMENT

Plaintiff also alternately brings an unjust enrichment claim against the defendant. The elements of an unjust enrichment claim are (1) a benefit conferred upon the defendant by the plaintiff; (2) the appreciation by the defendant of such benefit; and (3) the acceptance of the benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof. *Freeman Indus. LLC v. Eastman Chem. Co.,* 172 S.W.3d 512, 525 (Tenn.2005). "The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust." *Id.* (citing *Whitehaven Cmty. Baptist Church v. Holloway,* 973 S.W.2d 592, 596 (Tenn.1998)). [A] plaintiff need not establish that the defendant received a direct benefit from the plaintiff. Rather, a plaintiff may recover for unjust enrichment against a defendant who receives any benefit from the plaintiff if the defendant's retention of the benefit would be unjust. Id. at 526.

The facts of this case are similar to those in *Lawler v. Zapletal*, where the Tennessee Court of Appeals summarized:

> The defendants knew plaintiff obtained bookings with the "Golden Rocket" in Phoenix, Arizona, and the Opryland Hotel in Nashville. Defendants played these dates, and plaintiff made demand for payment after defendants had played, but defendants declined to pay.

13

> Three managers and/or booking agents testified, two on behalf of plaintiff, and one on behalf of defendants. Each testified that a person who books an act into a club is entitled to payment regardless of whether the act has played the club before or is currently discussing a return engagement with the club and that this is a recognized custom in the industry. They testified that the customary commission for bookings of that nature is ten, fifteen, or twenty percent of the gross bookings. The four dates played by defendants, booked by plaintiff, resulted in the gross payment to defendants of $65,300

*Lawler v. Zapletal* 679 S.W.2d 950, 955 (Tenn.App.,1984). The Chancellor had awarded damages to plaintiff on the theory of "unjust enrichment" in the amount of $6,530 because he found that "defendants were desirous of the bookings, that defendants knew that plaintiff obtained the bookings, that plaintiff expected to be paid a commission for the bookings, and that the custom in the music industry is that an agent receive a commission for bookings." *Id.* at 955.

In this case, FIT clearly knew the practice in the industry was for fiber sellers to furnish a rebate to the manufacturers of filters for their specification of the seller's particular fiber in their order to the felt manufacturer because the parties stipulated in their final pretrial order:

> 16. In the Fall of 2007, FIT was informed by representatives of Southern Felt that FIT's competitors for PPS fiber sales to the filtration bag industry were offering rebates to the filter bag manufacturing for specifying their brand of PPS fiber in the manufacture of felt used in the filter bags.

In addition, Mike Hodge testified at trial that he was told by Southern Felt that his competitors were offering rebates and to maintain his business he would have to offer rebates as well.

Based upon the record in this case, the Court FINDS that a benefit was conferred upon FIT through Southern Felt who manufactured felt from PPS fibers sold by FIT; the use of FIT material was specified by AFT when ordering felt from Southern Felt; that FIT was desirous of selling PPS fiber to Southern Felt; that FIT knew AFT was instrumental in obtaining the sale to Southern Felt;

14

that AFT expected to be paid a rebate for the sale; and that the custom in the filter bag business is that a manufacturer of filter bags receives a rebate from the sale of specified PPS fiber to the manufacturer of the felt to be used in its filter bags. AFT continued to specify FIT fiber on its projects rather than fiber from FIT's competitors who also had rebate agreements with AFT during that time frame. Consequently, FIT received a benefit of millions dollars of revenue[2] because of this designation when this revenue could have gone to FIT's competitors who would have paid AFT a rebate. Thus, FIT's acceptance of the benefit was under circumstances such that it would be inequitable for it to retain the benefit without payment of a rebate, and the Court finds that AFT is entitled to recover on its claim of unjust enrichment.

### IV. DAMAGES

"The measure of compensation for unjust enrichment is based on the reasonable value of the services to be judged by the customs and practices prevailing in that type of business." *Lawler*, 679 S.W.2d at 955, *quoting Chisholm v. Western Reserves Oil Co.,* 655 F.2d 94, 96 (6th Cir.1981). As previously stated, it is the custom and practice in the filter bag business that a manufacturer of filter bags receive a rebate for the sale of specified PPS fiber to the manufacturer of the felt to be used in its filter bags.

On the first day of trial, Ben Davis, Sales Representative for Southern Felt, testified that Southern Felt used whatever PPS fiber was available if a certain fiber was not specified, and that he was not aware of an oral agreement to use FIT fiber for orders where no fiber was specified. He also testified that the following invoices did specify the use of FIT fiber: 9696, 9697, 9701, 9695, 10107, 10108, 10198, 9699, 9700, 10164, 9702, 11168, 11296, 11225, 11190, 11663, 11805, 11345, 11380,

---

[2] See Trial Exhibit 20.

15

11250, and 12254. Certain other invoices reflect that FIT fiber was used even though it was not specified on the order, and certain invoices show that FIT was not used. The Court concludes that there was unjust enrichment in regard to the invoices that specified the use of FIT fiber, but there was no unjust enrichment in regard to invoices that used FIT fiber where FIT fiber was not specified by AFT. It goes without saying that there was no unjust enrichment in regard to those invoices that did not involve FIT fiber. However, Davis also testified that he did not take into account the scrim[3] that would be used in the manufacture of the felt, that he did not know what the scrim weighed that was included in those orders, and that scrim is not made from FIT fiber. At the end of the day, the parties agreed to stipulate to reduce damages by the amount of the scrim.

On the second day of trial, Ruth Ann Henderer provided Exhibits 63 and 64 which were revised damage lists with a calculation deducting scrim from the weights to which a rebate applied. Exhibit 63 indicates that there are three (3) ounces of scrim in every sixteen (16) ounces or one pound of felt. Deducting three (3) ounces of scrim from the total weight in pounds on the AFT PPS Purchase Rebate Claims specified above results in the following damages.

| YEAR | YARDS SHIPPED | SCRIM | REBATE |
|------|---------------|-------|--------|
| 2008 | 449,502 pounds - 79,575 pounds of scrim = 369,927 pounds X .57 = | | $210,858.39 |
| 2009 | 225,364 pounds - 39,199 pounds of scrim = 186,165 pounds X .57 = | | 106,144.05 |
| | | **TOTAL REBATE** | $317,002.44 |

### *V. CONCLUSION*

Based upon the foregoing reasons, it is hereby **ORDERED** that judgment will be entered

---

[3] Wikipedia defines scrim as a woven backing material contained in a filter.

for the plaintiff against the defendant under the doctrine of unjust enrichment in the sum of $317,002.44 which is the total rebate due for the years of 2008 and 2009. The plaintiff is also awarded against the defendant prejudgment interest at the rate of ten percent (10%) per annum from the filing of plaintiff's complaint on November 18, 2011 to the date of judgment[4]; and post-judgment interest against FIT to be calculated in accordance with 28 U.S.C. § 1961. The plaintiff should submit its interest calculations within 14 days of the date of this order.

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE

---

[4] Although the plaintiff seeks prejudgment interest from January 18, 2010, which is the date that plaintiff made a comprehensive demand for payment for the 2008 and 2009 rebate amounts with a detailed analysis of fiber orders and usage, the plaintiff failed to file suit against the defendant until almost 2 years later. Prejudgment interest may at times be inappropriate, such as when the party seeking prejudgment interest has been so inexcusably dilatory in pursuing a claim that consideration of a claim based on loss of use of the money would have little weight. *Scholz v. S.B. Intern., Inc.*, 40 S.W.3d 78, 83 (Tenn.Ct.App.,2000), citing *R.E.M. v. R.C.M.,* 804 S.W.2d 813, 814 (Mo.Ct.App.1991).